Catherine E. Ybarra (SBN 283360)
**SIRI & GLIMSTAD LLP**
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Tel: 213-297-3807
E: cybarra@sirillp.com

Sonjay C. Singh (*pro hac vice anticipated*)
**SIRI & GLIMSTAD LLP**
400 East Pratt Street
8th Floor - #16946751
Baltimore, MD 21202
Tel: (212) 532-1091
E: ssingh@sirillp.com

*Attorneys for Plaintiff and the Proposed Class*

*[Additional Counsel on Signature Page]*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **LEROY DAVIS**, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**CENIKOR FOUNDATION**<br><br>Defendant. | Case No. '26CV2692 BTM VET<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# CLASS ACTION COMPLAINT

Plaintiff Leroy Davis ("Plaintiff"), individually and on behalf of all similarly situated persons, alleges the following against Defendant Cenikor Foundation ("Cenikor" or "Defendant") based upon personal knowledge with respect to himself and on information and belief derived from, among other things, investigation by his counsel and review of public documents as to all other matters:

## I. INTRODUCTION

1. A person's struggle with alcohol or drug addiction is often among the most sensitive, and closely guarded facets of their life.

2. The unwanted disclosure of such information can be enormously harmful. It can impact an individual's reputation, livelihood, and personal relationships. And, if people struggling with addiction are unable to trust that the organizations purporting to offer treatment will protect their sensitive, private information, they are much less likely to seek help when they need it most.

3. Unfortunately, unbeknownst to Plaintiff and other visitors to Defendant's website, Defendant does not keep sensitive information about its visitors private. Instead, Defendant records the fact that its website visitors, like Plaintiff and Class Members, are seeking help for drug or alcohol addiction, the specific treatment centers that its website visitors contact for treatment, and information submitted by website visitors pertaining to their health insurance (collectively, "Sensitive Health Information"), and transmits that information to third parties, including Alphabet, Inc. ("Google"), Meta Platforms, Inc. ("Facebook" or "Meta"), Snap Inc. ("Snapchat"), X ("Twitter"), TikTok Ltd. ("TikTok"), Microsoft Corporation ("Microsoft"), Quantcast, HubSpot, and perhaps other third parties (collectively, the "Tracking Tool Providers"), through its use of surreptitious online tracking tools.

4. Online advertising giants like the Tracking Tool Providers compile as much information as possible about American consumers, including information relating to the most private aspects of their lives, as fuel for their massive, targeted advertising enterprises. Thus, any information about a person captured by those online behemoths can be used to barrage that person with ads. If a Tracking Tool Provider receives information that a person suffers from an addiction, they will use that information, and allow their clients to use that information, to stream ads to that person's computers and smartphones for products and services related to their addiction.

5. The Tracking Tool Providers offer website operators access to their proprietary suites of marketing, advertising, and customer analytics software, including Google's *Google Analytics*, *Google AdSense*, and *Google Tag Manager* products; Meta's *Facebook Pixel* and *Meta Pixel*; Snap's *Snap Pixel*; Twitter's *X Pixel*; TikTok's *TikTok Pixel*; Microsoft's *Clarity*, *LinkedIn Insight Tag*, *Microsoft Advertising*, *Bing Ads*, and *Xandr* products; Quantcast's *Quantcast Live Tag*; HubSpot's tracking code; and other similar tools (collectively, the "Business Tools"). Armed with these Business Tools, website operators can leverage the Tracking Tool Providers' enormous databases of consumer information for purposes including deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

6. The Tracking Tool Providers' massive databases of consumer information only exist, and can only exist, because users of the Business Tools, like Defendant, provide their users' data to the Tracking Tool Providers. To use any one of the Tracking Tool Providers' Business Tools, a website operator must install the Tracking Tool Provider's internet surveillance software onto their website, including tracking pixels ("Pixels") and cookies (collectively, the "Tracking Tools").

7. For example, if a website operator wishes to use Google Analytics, it must install Google's Tracking Tools onto its website and allow Google's Tracking Tools to share user data with Google. Moreover, if a website operator wishes to track specific information in Google Analytics, such as submissions of an online form, the website operator must configure the Tracking Tools to track form submissions.

8. Similarly, Microsoft's Clarity tool requires that all collected user data be sent to Microsoft; it does not allow users of the tools, like Defendant, to store and control the data. So, once installed, Microsoft's Tracking Tools capture detailed information about every visitor to the website, which may include the specific webpages visited by a website user, information entered into online forms by a website user, the device characteristics of a website user's phone or computer, detailed information about how the user scrolls on the website and where the user's mouse moves, and more. Moreover, this sensitive information almost always includes a unique identifier that the Tracking Tool Providers use to identify that user, regardless of what computer or phone is used to access the website.

9. Google and Microsoft are not unique – the other Tracking Tools similarly send customer data to the Tracking Tool Providers in exchange for use of the Tracking Tools.

10. In essence, when website operators use the Tracking Tool Providers' Business Tools, they choose to participate in their mass surveillance network and, in turn, benefit from the Tracking Tool Providers' collection of user data at the expense of their customers' privacy.

11. Cenikor is one of the many companies that has chosen to prioritize its marketing efforts over its customers' privacy, by installing Tracking Tools on its website.

/ / /

12. Cenikor is a medical provider specializing in addiction treatment services, including medication-assisted addiction treatment, psychiatric counseling, outpatient addiction treatment, and in-patient addiction treatment. It is "[o]ne of the largest private providers of drug and alcohol treatment services in Texas, with fourteen locations in Texas and New Mexico. [1] Cenikor's website – www.cenikor.org (the "Website") – allows potential clients, wherever they live, to research its programs, initiate a call with Defendant's admissions employees directly, complete a "Get Help" form for oneself requesting more information, and complete an online assessment to verify whether their medical insurance provider covers treatment at Cenikor ("Insurance Verification").

13. Defendant tells potential patients that their "admission advisors will be happy to verify if we accept your insurance and start a brief and confidential screening." [2] Moreover, just above the button used to submit an insurance verification request, Cenikor emphasizes that "Cenikor Foundation is committed to protecting and respecting your privacy, and we'll only use your personal information to administer your account and to provide the products and services you requested from us." And elsewhere on Cenikor's site, it reassures potential patients "that your communication with us is always private and confidential. **We will not share your information**."[3] For outpatient services, Cenikor tells patients that "your privacy is protected by HIPAA-compliant systems and secure virtual

---

[1] *Cenikor Locations*, CENIKOR, https://www.cenikor.org/cenikor-locations/ (last visited Apr. 2, 2026).

[2] *Verify Your Insurance*, CENIKOR, https://www.cenikor.org/verify-insurance/ (last visited Apr. 2, 2026).

[3] *About Cenikor*, CENIKOR, https://www.cenikor.org/about-us/ (last visited Apr. 2, 2026).

platforms,"[4] admitting that "Privacy protection is the cornerstone of ethical residential treatment."[5]

14. Among Cenikor's Frequently Asked Questions, it provides the following:

> **What confidentiality protections are in place for individuals seeking treatment?** Confidentiality protections are rooted in strict laws such as HIPAA, ensuring that personal information shared during care remains private and secure. Providers are only allowed to disclose details with explicit patient permission, much like locking away sensitive files in a secure vault. These protocols foster trust, encouraging individuals to seek help with the confidence that their privacy is safeguarded throughout their wellness journey.[6]

15. Even Cenikor's Privacy Policy offers reassurance to patients. It states, to begin, that "Your privacy is very important to Cenikor."[7] The policy also reassures patients that:

- Cenikor will collect and use personal information solely for the objective of fulfilling needs specified by us, and for other compatible purposes, unless we obtain the written consent of the individual concerned, or as required by law.

---

[4] *Free Outpatient Programs*, CENIKOR, https://www.cenikor.org/programs/outpatient-services/free-outpatient-programs/ (last visited Apr. 2, 2026)

[5] *Inpatient Drug Rehab Houston*, CENIKOR, https://www.cenikor.org/resources/inpatient-drug-rehab-houston/ (last visited Apr. 2, 2026)

[6] *Co-Occurring Disorders Treatment*, CENIKOR, https://www.cenikor.org/resources/co-occurring-disorders-treatment/ (last visited Apr. 2, 2026)

[7] The current Notice, dated October, 2025, is available at https://www.cenikor.org/privacy-policy/ (last visited Apr. 2, 2026). Plaintiff does not know whether or how this policy differs from the policy in effect at the time he visited the Website.

- Personal data should be relevant to the purposes for which it is to be used, and, to the extent necessary for those purposes, should be accurate, complete, and up-to-date.
- Cenikor will protect personal information by means of reasonable security safeguards against loss or theft, as well as unauthorized access, disclosure, copying, use, or modification.
- Unless compelled to do so by law, Cenikor never sells, exchanges, or otherwise reveals names, email addresses, or any other data relating to subscribers, members, contributors, or site users of cenikor.org to any third party or organization without the explicit permission of that subscriber, member, contributor, or site user; nor do we supplement this information with data provided by third-party providers.

16. Cenikor's Privacy Policy further notes that the website collects various types of information, such as "Information automatically collected when visiting our website, which may include cookies, third party tracking technologies, and server logs."[8] But this vague warning would not tell a reasonable patient that, contrary to every other reassurance Cenikor provides, it shares information with third parties sufficient for those third parties to learn its patients' private health information.

17. Nonetheless, when Plaintiff and Class Members visited the Website, their personal Sensitive Health Information was tracked by Defendant using the Tracking Tools and shared with the Tracking Tool Providers. Defendant ***never*** obtained authorization from Plaintiff or Class Members to share their Sensitive Health Information with third parties. Defendant's website does not even provide any "Cookie Banner" to alert inform patients that they should investigate further. At all relevant times to this action, Plaintiff and Class Members gave no informed consent for their Sensitive Health Information to be transmitted to third parties,

[8] *Id.*

including three of the largest advertisers and compilers of user information, Google, Meta, and Microsoft, and including the other Tracking Tool Providers.

18. Health information is regulated by both state and federal law, including the Health Insurance Portability and Accountability Act ("HIPAA"), which imposes criminal penalties on disclosing individually identifiable health information to a third party, including information that "is created or received by a health care provider" and "relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual[.]"[9]

19. Accordingly, Defendant's disclosure of Plaintiff's and Class Members' Sensitive Information constitutes a violation of HIPAA.

20. As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) lack of trust in communicating with online service providers; (iii) emotional distress and heightened concerns related to the release of Sensitive Health Information to third parties; (iv) loss of benefit of the bargain; (v) diminution of value of their Sensitive Health Information; (vi) statutory damages; and (vii) continued and ongoing risk to their Sensitive Health Information.

21. Therefore, Plaintiff seeks, on behalf of himself and a class of similarly situated persons, to remedy these harms and asserts the following statutory and common law claims against Defendant: Invasion of Privacy; Breach of Confidence; Breach of Fiduciary Duty; Negligence; Breach of Implied Contract; Unjust Enrichment; violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2511, *et seq.*; violations of the California Invasion of Privacy Act, Cal. Penal Code §§ 631, 638.50 & 638.51; Invasion of Privacy under the California Constitution;

---

[9] 18 U.S.C. § 1320d-(6).

violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; and violations of the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502.

## II. PARTIES

***Plaintiff Leroy Davis.***

22. Plaintiff Davis is a citizen of the State of California, residing in San Diego County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

23. Plaintiff worked in sales positions for decades, where effectively all of his take-home pay was commission based. He and his coworkers would often turn to alcohol to alleviate the stress of the job, and the related stress of inconsistent paychecks. Since he retired, Plaintiff was advised by a medical provider that he may be a high-functioning alcoholic, and began looking into treatment options.

24. In or around February and March of 2026, Plaintiff utilized the Website on his personal electronic devices, including a mobile phone and a laptop computer, to research various programs to treat alcohol abuse, including the programs offered at Cenikor, and was using the Website to evaluate whether its programs were conducive to treating this condition.

25. Unbeknownst to Plaintiff, the Website transmitted the Sensitive Health Information that he communicated to Defendant using the Website, including that he researched various treatment facilities close to the homes of his family members in Houston and Dallas, and that he had filled out the form to analyze his insurance and to request information from Defendant.

26. Among the Sensitive Health Information that Plaintiff disclosed to Defendant, and which Defendant allowed and enabled third parties including Google, Meta, Microsoft, and other Tracking Tool Providers to intercept, was:

1) that Plaintiff struggles with alcohol addiction; 2) that Plaintiff was seeking treatment for his alcohol addiction; and 3) that Plaintiff initiated, filled out, and submitted a request for Defendant to analyze whether his insurance provider would cover treatment.

27. From this information, the Tracking Tool Providers were able to infer that Plaintiff has alcohol addiction. Defendant's disclosures to third parties were accompanied by Plaintiff's PII, including the disclosure of the unique identifiers each Tracking Tool Provider has for Plaintiff.

28. Plaintiff never authorized Defendant to disclose any aspect of his communications with Defendant through the Website to third parties, including the Sensitive Health Information that he provided to Defendant.

29. On every occasion that he visited the Website, Plaintiff possessed accounts with Google and other Tracking Tool Providers, and he accessed the Website while logged into his Google and other accounts on the same device.

30. After providing his Sensitive Health Information to Defendant through the Website, Plaintiff immediately began seeing targeted online advertisements for health services and products related to treatment for alcohol addiction. Seeing these repeated advertisements irritated Plaintiff, as he makes an effort to protect his privacy on the internet to the extent possible by, for example, declining optional cookies.

31. Though Plaintiff is upset by Defendant's disclosure of his private health information, he is in a fortunate position such that he has minimal personal risk associated with filing this lawsuit under his name. He is retired, and therefore he does not fear adverse employment consequences if others learn that he struggles with alcohol abuse. He acknowledges the stigma associated with addiction and considers it unfair. Moreover, he understands that many other affected individuals

may be unwilling to come forward, for fear of naming themselves publicly and causing further privacy harms.

32. For these and other reasons, he seeks to use his position to protect not only his privacy rights, but also the privacy rights of others for whom the impact of disclosure may be more acute.

***Defendant Cenikor Foundation***

33. Defendant Cenikor Foundation is organized in the State of Texas with its principal place of business at 1931 Wickchester Ln, Suite 300, Houston, TX 77043.

34. Defendant operates fourteen addiction treatment facilities serving adults and/or children, all but one of which is in Texas. Defendant offers various options for treatment, including partial hospitalization, inpatient services, outpatient services, and virtual services. With its virtual options, Defendant allows patients to obtain treatment entirely online.

35. Defendant's website contains no indication that its services are unavailable to California residents. Further, when Plaintiff contacted Defendant seeking treatment, identifying himself as a California resident, Defendant did not state or suggest that Plaintiff's California residence made him ineligible for treatment through Defendant's services.

## III. JURISDICTION AND VENUE

36. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because Plaintiff and many putative class members are citizens of a different state than Defendant.

/ / /

37. Additionally, this Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint asserts a claim for violation of federal law, specifically, the ECPA, 18 U.S.C. § 2511. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

38. This Court has specific personal jurisdiction over Defendant because Plaintiff's complaint alleges a violation of California Law, and that the violation is directly tied to Defendant's minimum contacts with Plaintiff in California. As a California Resident, Plaintiff is protected by California Invasion of Privacy Act, Cal. Penal Code §§ 631, 638.50 & 638.51; Invasion of Privacy under the California Constitution; violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; and violations of the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502. Plaintiff alleges that Defendant violated these laws through a website which improperly disclosed his private health data, and the private health data of other California residents, when he and other residents were investigating treatment options.

39. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims in this action occurred in this judicial district, and because Plaintiff resides in this district.

## IV. FACTUAL ALLEGATIONS

### A. THE CENIKOR WEBSITE

40. Founded in 1967, Cenikor is a private, nonprofit institution that offers outpatient, inpatient, and online health services. It offers inpatient and outpatient treatment programs to youth and adults, and offers detox programs, partial hospitalization, virtual treatment, and more.

/ / /

41. Cenikor wholly owns and operates the Website, available at www.cenikor.org.

42. Unbeknownst to prospective, current, and past students, Cenikor secretly embeds a host of tracking technologies on the Website, allowing the interception of the private PII and sensitive health records of prospective patients visiting the Website.

**B. BACKGROUND ON TRACKING TECHNOLOGY**

43. Pixels are one of the more common forms of tracking technology used by website operators to track users' behavior, interactions, and the content of their communications online.

44. Pixels are typically snippets of code embedded on a website that surreptitiously intercept a user's actions, including private communications on that app or property.

45. Pixels can collect a shocking amount of private information regarding an individual's online communications, including their searches, queries, what content they select and view, what they enter into online forms, and their habits and behaviors.

46. Web developers, like Cenikor, can use pixels to send additional information specific to their website. As described herein, Cenikor configured the pixels at issue in this case to transmit and intercept patients' private records, including the health conditions they sought to treat, the treatment options they were considering, whether or not they had called Cenikor after visiting those pages, and whether or not they had submitted information to allow Cenikor to assess whether the prospective patients could become Cenikor patients.

47. In addition, the Cenikor website has a seemingly-private "Patient Portal," protected by a login. But if and when a patient clicks the link to login to the

Patient Portal, Cenikor shares that they clicked the link with the Tracking Tool Providers.

48. As the Federal Trade Commission ("FTC") explains, one of the purposes of using pixels is to monetize consumers' data:[10]

> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns . . . Another is that companies can monetize the data collected[.]

49. Particularly problematic, consumers have no way of knowing these pixels are present because they are invisible. The FTC further warns that: [11]

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with . . . Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.

50. As described in the sections below, Cenikor used Tracking Technologies provided by at least Google, Meta, Microsoft, TikTok, and others. Plaintiff and Class Members had no way of knowing Cenikor used these Tracking Technologies or that their private data would be used and intercepted as a result.

51. Especially problematic, Meta, Google, TikTok, and Snapchat are some of the largest advertising platforms in the world. Each of these entities use the intercepted information for their own commercial purposes, including to augment the profiles they maintain about individuals, and improve their technology for targeting individuals with ads both on properties they own and operate (e.g.,

---

[10] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last visited Mar. 3, 2026).

[11] *Id.*

Facebook, Instagram, Google.com, the TikTok or Snapchat apps) and other web properties that participate in their respective ad networks.

### C. GOOGLE'S TRACKING TECHNOLOGY

52. Google is one of the largest digital advertiser platforms in the country, with a market capitalization of over $3 trillion dollars. Google accounts for 26.8% of the total digital advertising revenue generated in the United States.[12] In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[13]

53. Google "make[s] money" from its "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising." [14]

54. Google offers various tracking technologies, including Google Analytics and Google Ads, which exist solely to help drive ad revenue. For instance, Google's analytics products integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct

---

[12] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed Oct. 23, 2025).

[13] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last accessed Oct. 23, 2025).

[14] ALPHABET INC. SEC FORM 10-K FOR FISCAL YEAR ENDED DECEMBER 31, 2020, https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

more individuals to use Google's ad network and products increasing Google's overall ad revenue. Products like Google Analytics, Google Chrome, and Google's Android operating system also improve the company's advertising network and capabilities by providing direct pipeline to Google of data that it uses to enrich the vast amount of interconnected data it maintains about them.

55. Google advertises Google Analytics and other business tools to website operators to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[15]

56. Google Analytics is deployed by dropping a piece of Google-engineered code on a given web property or app. This code contemporaneously intercepts a user's interaction with the web property or app every time the user visits or uses it, including what pages they visit, what they click on, and input into text fields.

57. The code also collects multiple pieces of identifiable information so that Google can connect that data within its systems to a specific individual. This includes multiple cookie values Google creates for this precise purpose, along with device information, such as unique ad identifiers and settings used to create a digital "fingerprint" for people, IP addresses that tie them to specific locations (like their home), and more. This does not require a person to have a Google account, to be signed into their Google account, or using a Google product. Google has a special set of cookies and systems created specifically to track and identify individuals not signed into a Google product at the time they use a website, or who attempt to use private browsing mode.[16]

---

[15] *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last accessed Oct. 23, 2025).

[16] *Brown v. Google LLC*, 685 F. Supp. 3d 909, 925 n.11 (N.D. Cal. 2023).

58. Google provides web property owners with analytics about their sites and apps based on this data, including reports on acquisition (e.g., information about where the customer's traffic originates, the methods by which users arrive at the customer's site or app, and the marketing efforts the customer uses to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits), and demographics (e.g., classify the customer's users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities). However, the main purpose of Google's tracking technologies, including Google Analytics, is to promote targeted ads both on Google.com (so called "search ads" or "Google ads") or other Google owned and operated products (e.g., YouTube), and across Google's display network (Google "display ads") which include thousands if not millions of web properties.

59. In addition to providing customers with analytics ads services, Google also uses the data collected through Google Analytics and other tracking technologies for its own purposes, including to improve its ad targeting capabilities, machine learning and AI models, products and services, and data collections on users. Thus, the data Cenikor disclosed, and allowed Google to intercept, is actively used by Google to improve and serve advertisements. And individual consumers who have their data disclosed by one entity (for instance, Cenikor) will see ads for other entities based on their data as a result of Google's advertising system.

60. Further, customers like Cenikor can also send data to Google through a server-to-server connection or through a third-party intermediary. This allows customers like Cenikor to disguise what data it sends to Google because no one (other than these parties) can observe what data is sent server-side.

/ / /

/ / /

### D. META'S TRACKING TECHNOLOGY

61. Meta operates the world's largest social media company and generated $164 billion in revenue in 2024, almost all of which comes from advertising. Meta's advertising business has been extremely successful due, in large part, to Meta's ability to target people at a granular level.

62. In conjunction with its advertising business, Meta encourages and promotes entities and web property owners, such as Cenikor, to utilize its "Business Tools" to gather information about people, identify, target, and market products and services to them.

63. One such Business Tool is Meta Pixel. Upon its release in 2015, Meta touted Meta Pixel as a new way to gain insights about how people use your website. The "pixel" itself is a small snippet of website code written by Meta engineers. To use the Meta Pixel, an advertiser places a pixel (i.e., a code snippet) on their website.

64. The Meta Pixel is designed to "track[] the people and type of actions they take" across all pages accessible on a web property (e.g., such as all pages accessible under cenikor.org) with a single code snippet.[17] When a user accesses a webpage on a web property using Meta Pixel, their communications with *every* webpage are instantaneously and surreptitiously intercepted and recorded by Meta's code and sent to Meta's servers.

65. Through this technology, Meta intercepts information about each page a user visits, what buttons they click, as well as specific words they type into form boxes (e.g., when applying for admission, signing up for a class, or searching) on the web property. Meta also receives "events" data reflecting data fields identified by the web property owner, which can reveal even more information about the individual and their specific interactions or communications.

---

[17] *Retargeting*, META, https://www.facebook.com/business/goals/retargeting (last visited January 14, 2026).

66. The information Meta receives via the Meta Pixel includes identifying information that is sufficient to identify a particular individual either directly (e.g., by name or email) or in combination with other information, like unique devices identifiers, cookie values, IP addresses, already in Meta's possession (e.g., either because it was collected from a another web property using its Tracking Technology or the individuals' use of a Meta owned and operated app or property).

67. For instance, Meta uses "[a]dvanced matching" techniques to link the data received via the Meta Pixel to Facebook users[18] and also analyzes information entered in online forms to uncover further PII about the user, such as their email address, to further identify each respective individual.[19]

68. Meta stores the data captured by its Tracking Technology on its own servers for its own commercial purposes. Meta then provides the web property owner whose property this information is recorded from with access to analytics generated from the data recorded (e.g., which users took certain actions on any given webpage, how many, etc.). This is accessed through the web property owner's Facebook Ads Manager account, as well as potentially through the Facebook Events Manager.[20] The data available to the web property owner is a limited set and *does not* include all information Meta has about the individuals whose communications and actions it recorded through its Tracking Technology.

69. In this way the Meta Pixel has two purposes: (1) it enriches Meta's ability to collect data about individuals across the web, and enriches its profiles

[18] *Advanced Matching*, META https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching/ (last visited January 26, 2026).

[19] *About advanced matching for web*, META https://www.facebook.com/business/help/611774685654668?id=1205376682832142 (last visited January 26, 2026).

[20] *Conversion Tracking*, META https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited January 26, 2026).

about them, and (2) facilitates web property owners spending money on Meta ads. For instance, Meta encourages website owners to create "custom audiences" of users who have taken the same or similar actions on the website based on the data received through the Meta Pixel to target them directly with ads. Meta also uses this audience to "identify other Facebook users" similar to them (i.e., "lookalikes") and to "target [those similar users] with [the website owner's] ads."[21] Meta uses the full complement of data in its possession—not just that received from the web property—to identify these individual targets.

70. Meta also uses the data it receives through the Meta Pixel to fuel its own advertising business. Meta's documentation confirms that Meta feeds the data received through the Meta Pixel into "machine learning models" that "consider that person's behavior" to predict who is likely to respond to any given ad, making its advertising services even more lucrative.[22] These machine learning models "learn[]" more about individuals as they "receive[] new data."[23] Thus, each person whose data Meta receives through the Meta Pixel directly contributes to how successful Meta is at targeted advertising and contributes to Meta's ad revenue. And individual consumers who have their data disclosed by one entity (for instance, Cenikor) will see ads for other entities based on their data as a result of Meta's advertising system.

71. In true "move fast and break things" spirit, Meta built these systems to sell ads without incorporating any way to limit the use of data collected through Meta Pixel, or prevent Meta Pixel from acquiring sensitive data. According to leaked internal Meta documents, Meta does "not have an adequate level of control

---

[21] *Id.*

[22] *Good Questions, Real Answers: How Does Facebook Use Machine Learning to Deliver*, META (June 11, 2020), https://www.facebook.com/business/news/good-questions-real-answers-how-does-facebook-use-machine-learning-to-deliver-ads.

[23] *Id.*

and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'" Thus, any data the Meta Pixel intercepted from the Website was incorporated into Meta's ads systems and models to benefit its business.

72. Meta's customers, like Cenikor, can also send data to Meta through a server-to-server connection or through a third-party intermediary (e.g., sending data to a data platform like AppsFlyer or mParticle which then routes traffic to Meta and others). This allows customers like Cenikor to disguise what data it sends to Meta because no one (other than these parties) can observe what data Cenikor uploads directly to Meta for use in ads, or sends through third parties. Which data Cenikor uploaded to Meta directly or sent through third parties and how that data is used, accordingly, will be uncovered during discovery.

**E. TIKTOK'S TRACKING TECHNOLOGY**

73. TikTok is a social media company that allows users to share and watch short-term video content, subscribe to other TikTok users, and find videos and content creators relevant to their interests. While TikTok is a newer entrant to the online advertising industry, it has grown rapidly, with its global ad revenue estimated to surpass $32 billion this year.[24]

74. TikTok has more than 1 billion monthly users worldwide and is one of the top five largest social media companies. TikTok's main source of revenue is selling ads.

75. To increase its advertising revenue, TikTok offers tracking and analytics services, including through the TikTok Pixel, which compliments its advertising business.

---

[24] *Platform Insights: TikTok 2025*, WARC (Mar. 4, 2025), *available online at*: https://www.warc.com/content/paywall/article/Warc-Data/Platform_Insights_TikTok_2025/en-GB/159437?.

76. The TikTok Pixel (like the other tracking technologies described above) is a piece of TikTok engineered code that web property owners place on a website. Once installed, the pixel tracks users' interactions, including what pages they view, buttons they click on, and information they enter, along with a unique identifier. The TikTok Pixel intercepts these communications immediately after they are sent and before they are received by the website operator.

77. In addition, the TikTok Pixel collects information that directly or in combination with information already in its possession identifies an individual. This includes the users' IP address, digital fingerprint data (e.g., the device make, model, and operating system, browser information), a unique session ID, and cookie values that can be associated with a specific user. For instance, TikTok states that it uses the cookie values it collects and/or its "Advanced Matching" feature to "recognize and learn about *people* from [the] website and the types of actions *they* do or don't take." (emphasis added)

78. In April 2022, TikTok started automatically collecting first- and third-party cookies[25] across all websites that incorporated the TikTok Pixel prior to March 10, 2022. By capturing identifiers used by web property operators as well as other third parties, TikTok broadens its ability to track individuals across web properties and apps and to identify them by joining data against these various identifiers. This enhances TikTok's ability to target users on its platform with ads, matching that data against information associated with their TikTok account.

79. Indeed, TikTok admits that it will "match" the information collected through its Tracking Technologies with "corresponding accounts on TikTok inventory to create a subset of matched IDs . . . and combine those Matched IDs

[25] First-party cookies are supposed to be cookies set by the website domain owner, whereas third-party cookies are cookies set by anyone other than the website domain owner.

with corresponding" data collected from other website operators and through its products.[26]

80. Similar to Meta and Google, customers like Cenikor can also send data to TikTok through a server-to-server connection or through a third-party intermediary. This allows customers like Cenikor to further disguise what data it sends to TikTok because no one (other than these parties) can observe what data is sent server-side. Information about which data Cenikor uploaded to TikTok directly or through third parties is exclusively within Cenikor's possession and control and thus will be identified during discovery.

### F. SNAP'S TRACKING TECHNOLOGY

81. Snap is a publicly traded company with over 900 million daily active users across the globe. As Snap admits in its filings with the SEC, "substantially all of [its] revenue" is generated from advertising, with 91% of its revenue in 2024 coming from ads.

82. As Snap also admits, its advertising business "rel[ies] heavily" on its "ability to collect, process, and disclose data" including "personal data" to advertisers and others.[27]

83. Like the other advertising giants above, Snap offers tracking tools, including the Snap Pixel, to collect information that feeds its advertising business.

84. The Snap Pixel (like other pixels) is a snippet of code placed on an advertiser's web property that tracks user actions as they interact with a website, including their actions and queries, such as viewing a particular webpage, making a purchase, and adding a specific item to their cart.

---

[26] *TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024), *available online at*: https://ads.tiktok.com/i18n/official/policy/business-products-terms.

[27] SNAP INC. SEC FORM 10-K FOR FISCAL YEAR ENDED DECEMBER 31, 2024, https://www.sec.gov/Archives/edgar/data/1564408/000156440825000019/snap-20241231.htm?

85. Snap "strongly" encourages its customers (i.e., web property owners) to send individual email addresses or phone numbers through the Snap Pixel so they can better target these individuals with ads, e.g., by joining the data intercepted with their Snap profile or other data in Snap's possession. In addition to these forms of PII, the Snap pixel also intercepts IP address, first and third-party cookies, and other browser information that helps to fingerprint users.[28] Snap uses this "variety of signals" to engage in "PII matching" and identify individuals.[29]

86. Snap uses this identifiable data, not only to serve ads on behalf of its customers, but for its own reasons. This includes training machine learning models, improving targeting capabilities, creating custom and "look-alike" audiences and models, and for reporting purposes.[30]

87. In addition to the Snap Pixel, Snap also has a Conversions API, which allows customers, like Cenikor, to send data directly to Snap through a server-to-server integration. Snap encourages customers to use these technologies together, which avoid detection because no one other than Snap and its customer can observe what data is sent through this connection.[31] [32] As with other upload only and third party data flows described above, which data Cenikor uploaded directly to Snap is exclusively in its possession and will be identified in discovery.

---

[28] *Pixel Implementation FAQs*, SNAP, INC., https://businesshelp.snapchat.com/s/article/snap-pixel-faq?language=en_US (last visited January 26, 2026).

[29] *Id.*

[30] *Id.*

[31] *Snap Pixel: Power Your Ad Performance*, SNAP, INC., https://forbusiness.snapchat.com/advertising/snap-pixel? (last visited January 26, 2026).

[32] This does not capture the full extent of the third parties whose Tracking Technologies Cenikor installed on the Cenikor Website, which can only be revealed in discovery.

**1. The Data Cenikor Disclosed Uniquely Identified Each Specific Class Member, Including Plaintiff**

88. Meta, Snap, Google, and TikTok provide customers like Cenikor with one or more unique identifiers precisely so each individual whose data is sent through the Tracking Technologies can be identified and targeted. For example, customers like Cenikor can send data to Meta alongside Meta-specific cookies, including the "fbc" cookie which is a first-party cookie containing a Facebook click identifier, and the c_user, fr, and datr cookies, all of which are an individuals Facebook User ID or linked to that unique identifier.[33]

89. Similar to the above, Google has its own collection of cookies, including the "ide" DoubleClick cookie, the "cid" identifier, and "sid" identifier. Meanwhile, Snap uses its own "u_sclid" identifier, and TikTok uses its "csid" cookie and "session_id." These cookies all serve the same purpose—to uniquely track and identify consumers. Upon information and belief, the other Tracking Tool Providers also have ids which, in many or most cases, can be used to identify a single individual.

90. In this way, these unique identifiers serve a similar function to social security numbers used by the United States Government—they are associated with only one person, much like the Government knows which specific person is associated with each social security number. Through these identifiers, the Tracking Tool Providers know which specific person is associated with each of their unique identifiers.

91. But this is not all Cenikor disclosed. The Tracking Tool Providers also obtained Plaintiff's and Class Members' IP addresses, which are also used to identify individual consumers. For instance, Meta uses consumers' IP addresses, either alone or in combination with other information, to match and identify each

[33] Meta also uses the "fbp" cookie which can act as a fallback to identify individual users when other identifiers are unavailable.

individual whose data it receives through its Tracking Technology. As described above in Sections IV(B-F), Snapchat, TikTok, and Google also collect IP addresses and use "signals" like these to individually identify individual consumers.

92. Google, Meta, Snap, and TikTok are especially able to identify individuals who have accounts with them. A remarkable number of Americans possess a Google, Meta, Snap or TikTok account. One-third of Americans have accounts with Google's Gmail e-mail client; over 80-percent of Americans use YouTube, Google's video client; over 70-percent report using Facebook, over one-third report using TikTok, and a quarter use Snapchat.[34] When these users visit a website, like the Website, that utilizes these companies' Tracking Technologies, any information collected by the Pixels can be linked to the user's respective accounts with these entities through identifiers and other means.

### 2. Cenikor's Unauthorized Disclosure of Plaintiff's and Class Members' sensitive information to Third Parties

93. Cenikor incorporated Tracking Technologies on the Website, including at least Tracking Tools by Google, Microsoft, Meta, Snapchat, Twitter, Quantcast, Twilio, HubSpot, and TikTok. Through these Tracking Tools, Cenikor disclosed Plaintiff's and Class Members' private communications to these third parties, as well as identifiable information, including their email addresses, unique user and device identifiers, digital fingerprint, and IP Addresses. The subsections, below,

[34] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ ((last accessed Oct. 23, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last accessed Oct. 23, 2025); Jeffrey Gottfried and Eugene Park, *Americans' Social Media Use 2025*, PEW RESEARCH (Nov. 20, 2025), https://www.pewresearch.org/internet/2025/11/20/americans-social-media-use-2025/ (last visited Mar. 4, 2026).

provide examples of the interception of Plaintiff's and Class Members' data from the Website.

94. Plaintiff and Class Members used the Website to research and access health treatments and services related to addiction treatment. While visiting the Website, Plaintiff and Class Members each called Defendant's admissions employees and/or took Defendant's Insurance Verification.

95. Unbeknownst to Plaintiff and Class Members, Defendant intentionally configured the Tracking Tools installed on the Website to capture and transmit the Sensitive Health Information that they communicated to Defendant through the Website to third parties, including Google and Microsoft.

96. The following screenshots ("Figures 1-10") depict examples of the network transmissions made by the Google Tracking Tools installed on the Website when users initiate a call.

97. As Figures 1-10 show, if a user browses to the "Houston Treatment Center" page, then clicks the link on that page to visit the "Inpatient Residential" page, and then presses the button labeled "Verify Insurance" at the bottom of that page, fills out the form on the "Verify Insurance" page, and then submits the form by clicking the "Get Help" button, Defendant's website will send information to Google Analytics containing 1) the name of the treatment location the user was attempting to contact, 2) the fact that the user browsed to the "Inpatient Residential" page, 3) the fact that the user visited the "Verify Insurance" page, 4) the fact that the user entered information into a field on the verify insurance page, along with the identifier of the field (e.g. "input_11_1" for "Patient's First Name"), and 5) the fact that the user submitted the form on the Verify Insurance form.

/ / /

/ / /




***Figure 1*** *Screenshot depicting a portion of the Houston Treatment Center page on Defendant's Website, including a link to the "Inpatient Residential" Page.*

Request URL https://analytics.google.com/g/collect?v=2&tid=G-E( …

…

tid G-E0YNP0S1PN

…

cid 250649826.1775157234

…

dl https://www.cenikor.org/locations/addiction-recovery-houston-detox-rehab/

…

dt Houston Treatment Center | Cenikor

en page_view

***Figure 2*** *Screenshot excerpts showing some of the information sent to Google Analytics when a user visits the "Houston Treatment Center" page, and the URL to which the information is sent. Included, but not shown, is Google's "sid" identifier.*




***Figure 3*** *Screenshot depicting a portion of the "Inpatient Residential" Page.*




***Figure 4*** *Screenshot excerpts showing some of the information sent to Google Analytics when a user visits the "Inpatient Residential" page after visiting the "Houston Treatment Center" page. Included, but not shown, are Google's "tid," "cid," and "sid" identifiers.*




***Figure 5*** *Screenshot depicting a portion of the "Inpatient Residential" page containing a button to "Verify Insurance" lower on the page.*




***Figure 6*** *Screenshot depicting the top portion of the "Verify Insurance" Page.*




***Figure** 7 Screenshot depicting the insurance verification form on a lower portion of the Verify Insurance page, identifying the input labeled "Patient's First Name" as having "id='input_11_1.'"*

| | |
|---|---|
| dl | https://www.cenikor.org/verify-insurance/ |
| dr | https://www.cenikor.org/programs/short-term-inpatient-residential/ |
| dt | Verify Your Insurance \| Cenikor |
| _tu | CA |
| en | form_start |
| ep.form_id | gform_11 |
| ep.form_name | |
| ep.form_destination | https://www.cenikor.org/verify-insurance/#gf_11 |
| epn.form_length | 50 |
| ep.first_field_id | input_11_1 |
| ep.first_field_name | input_1 |
| ep.first_field_type | text |
| epn.first_field_position | 3 |

***Figure 8** Screenshot depicting some of the information sent to Google when a user enters information into the "Patient's First Name" field with the id "input_11_1." Included, but not shown, are Google's "tid," "cid," and "sid" identifiers.*




***Figure 9*** *Screenshot depicting, in light blue, the form "gform_11" which, when submitted, will submit the action "/verify-insurance/#gf_11," the "ep.form_destination" referenced in* ***Figure 8****.*




***Figure 10*** *Screenshot depicting the "Get Help" button at the bottom of the Insurance Verification form which submits the form. This button is contained within the form "gform11" and is used to submit that form.*

| | |
|---|---|
| dl | https://www.cenikor.org/verify-insurance/ |
| dr | https://www.cenikor.org/programs/short-term-inpatient-residential/ |
| dt | Verify Your Insurance \| Cenikor |
| en | form_submit |

***Figure 11** Screenshot depicting some of the information sent to Google after the "Get Help" button is pressed to submit the Insurance Verification form. Included, but not shown, are Google's "tid," "cid," and "sid" identifiers.*

98. The screenshots above, for example, show a user visiting the website for Cenikor's Houston, TX location, navigating to Cenikor's Inpatient Residential page using a link on the Houston Treatment Center, navigating to the Verify Insurance page using a link on the Inpatient Residential page, entering information into the "gf_11" form on the Verify Insurance page, and then submitting the form. And the screenshots show that all the information above was sent to Google.

99. Google is perhaps the world's most advanced aggregator and analyzer of information. Its trade is to connect the dots, making complicated inferences using data, even when there is no obvious connection between those dots. But it does not take a heroic deduction, or Google's advanced aggregation and analysis abilities, to learn a user who has taken these actions, within this context, is considering inpatient addiction treatment at Cenikor's Houston, TX location.

100. Google's analytical power could be important if, for example, it did not have individually-identifying information about who took these actions. Then, as discussed above, Google might be able to use its digital fingerprinting technology to identify the user.

101. But, because each of these transmissions are accompanied by Google's "tid," "cid," and "sid" identifiers, which are, in most cases, already individually-identifying, Google does not need to rely on its digital fingerprinting technology. Accordingly, Google does not merely learn that an anonymous user is considering

addiction treatment, it learns that a specific, individually identified user is considering addiction treatment.

102. Moreover, the fact that form IDs and field IDs are used to identify which action was taken does not limit how much Google can learn in any meaningful way. Google regularly crawls across millions of web pages to determine and index their contents for its Search business. As shown by Cenikor's presence in Google search results, Google has crawled and indexed Cenikor's website. It would be a trivial matter for Google to determine, for example, that the "Verify Insurance" page on Cenikor's website contains only one form, the ID of that form, the ID of each field on that form, that the purpose of that form is for a user to submit their insurance information to evaluate whether they could receive treatment at Cenikor, or what action will occur when the form is submitted.

103. Cenikor's disclosures are not limited to Google. The other Tracking Tools installed on Cenikor's website transmit analogous information to their respective Tracking Tool Providers when the user takes various actions.

104. The screenshots below give examples of information sent to Snapchat, TikTok, and Twitter when a user clicks the "Get Help" button to submit the Verify Insurance form. Cenikor also sends each of these social media advertising companies information when users perform other actions.


```
url: "https://www.cenikor.org/verify-insurance/"
v: "3.54.7-2604012219"
▾ req: [{md: {btx: "GET HELP", btc: "gform_button button",…}, del: 128},…]
  ▾ 0: {md: {btx: "GET HELP", btc: "gform_button button",…}, del: 128}
      del: 128
    ▾ md: {btx: "GET HELP", btc: "gform_button button",…}
        btc: "gform_button button"
      ▸ btff: [{id: "input_11_2", name: "input_2", type: "email", placeholder: "E
        btx: "GET HELP"
```


…


```
u_scsid: "d67d3308-df9e-4937-86b2-b5d7be1d2395"
```


***Figure 12*** *Screenshot excerpts showing information sent to Snapchat, including its u_scsid identifier, when a user clicks the Get Help button to submit the Verify Insurance form.*

```
page_trigger: "Click"
▾ trigger_element: {tag: "BUTTON",…}
  ▸ attributes: {class: "gform_button button", id: "gform_submit_button_11", type: "submit"}
    inner_text: "GET HELP"
    num_child_buttons: 0
  ▸ position: {x: 379.734375, y: 842.09375}
    tag: "BUTTON"
    timestamp: "2026-04-03T13:21:43.982Z"
    xpath: "/HTML/body[1]/main[1]/section[2]/div[2]/div[1]/div[1]/div[2]/div[1]/form[1]/div[3
▾ context: {ad: {sdk_env: "external", jsb_status: 2}, device: {platform: "pc"},…}
  ▸ ad: {sdk_env: "external", jsb_status: 2}
  ▸ device: {platform: "pc"}
    index: 8
  ▸ library: {name: "pixel.js", version: "2.2.1"}
  ▸ page: {url: "https://www.cenikor.org/verify-insurance/",…}
```

…

```
    anonymous_id: "01KN7SVJHQFFFZCN2QJZM9DAT8_.tt.1"
```


***Figure 13** Screenshot excerpts showing information sent to TikTok , including its anonymous_id identifier, when a user clicks the Get Help button to submit the Verify Insurance form.*

| | |
|---|---|
| events | [["autobuttonclick",{"value":"GET HELP"}]] |
| tw_document_href | https://www.cenikor.org/verify-insurance/ |
| tw_iframe_status | 0 |
| tw_order_quantity | 0 |
| tw_pid_src | 2 |
| tw_sale_amount | 0 |
| twpid | tw.1775157233715.691353833660871179 |

***Figure 14** Screenshot excerpts showing information sent to Twitter (now X), including its twpid identifier, when a user clicks the Get Help button to submit the Verify Insurance form.*

105. Cenikor sends similar but more detailed information to Microsoft via the LinkedIn Insight Tag. The following is a portion of the information sent to Microsoft, including Microsoft's "pid" identifier, when a user clicks the Get Help button to submit the Verify Insurance Form.


```
{
  "pids":[7247081],
  "domain":"cenikor.org",
  "url":"https://cenikor.org/verify-insurance/",
  "pageTitle":"Verify Your Insurance | Cenikor",
```

```
    "signalType":"CLICK",
    "domAttributes":{
      "tagName":"BUTTON",
      "innerText":"GET HELP",
      "formAction":"/verify-insurance/#gf_11",
      "isFormSubmission":true,
      "onClick":"gform.submission.handleButtonClick(this);"
    },
    "isFilteredByClient":false
  }
```

[35]

106. Upon information and belief, the text "'isFilteredByClient':false" indicates to Microsoft that Cenikor explicitly allows it to collect this information.

107. The full extent of the information Cenikor sends to Quantcast via pixel.quantserve.com, and HubSpot via track-na2.hubspot.com, will be determined during discovery, but each of these tools tracks, at a minimum, how users move about the website.[36]

108. In their default state, the Tracking Tools record and transmit only "automatic events," consisting largely of routine user behavior, such as the URLs visited by internet users.[37] Defendant purposely configured the Tracking Tools on the Website to collect and transmit additional user data, including the specific buttons the users press, to collect even more information about how their website users are seeking addiction treatment.

/ / /

/ / /

/ / /

/ / /

[35] The information was sent to Microsoft in a compressed format. The information presented here was decompressed, formatted, and filtered, but otherwise unaltered.
[36] Cenikor may send only minimal information to Meta via connect.facebook.net. However, given the depth and breadth of Cenikor's disclosures, Plaintiff will seek discovery as to the information Cenikor discloses to Meta.
[37] *Automatically Collected Events*, GOOGLE ANALYTICS HELP, https://support.google.com/analytics/answer/9234069 (last visited Mar. 3, 2026).

### G. CENIKOR DID NOT HAVE PLAINTIFF'S OR CLASS MEMBERS' CONSENT TO SHARE THEIR SENSITIVE INFORMATION.

#### 1. Defendant Failed to Inform Plaintiff and Class Members of its Disclosure of their Sensitive Health Information.

109. Defendant breached Plaintiff's and Class Members' right to privacy by unlawfully disclosing their Sensitive Health Information to third parties, including the Tracking Tool Providers.

110. Specifically, Plaintiff and Class Members had a reasonable expectation of privacy. Defendant did not inform Plaintiff that it was sharing his Sensitive Health Information with third parties, including Google and Microsoft.

111. By engaging in this improper sharing of information without Plaintiff's and Class Members' consent, Defendant breached Plaintiff's and Class Members' right to privacy and unlawfully disclosed their Sensitive Health Information.

112. Despite never telling users like Plaintiff and Class Members, Defendant allowed third parties such as Google and Microsoft to intercept Plaintiff's and Class Members' Sensitive Health Information and use it for advertising purposes.

#### 2. The Tracking Tools Used by Defendant Were Imperceptible to Plaintiff and Class Members.

113. The Tracking Tools installed on the Website were invisible to Plaintiff and Class Members. Without analyzing the network information transmitted by the Website through examination of its source code or the use of sophisticated web developer tools, there was no way for a Website user to discover the presence of the Tracking Tools. As a result, typical internet users such as Plaintiff and Class Members were unable to detect the Tracking Tools on the Website.

114. Plaintiff and Class Members were shown no disclaimer or warning that their Sensitive Health Information would be disclosed to any unauthorized third party without their express consent. Instead, as discussed above, Cenikor's website repeatedly reassures users of the Website that their privacy will be respected.

115. Plaintiff and Class Members did not know that their Sensitive Health Information was being collected and transmitted to an unauthorized third party.

116. Because Plaintiff and Class Members were not aware of the Tracking Tools on the Website, or that their Sensitive Health Information would be collected and transmitted to the Tracking Tool Providers, they could not and did not consent to Defendant's conduct.

### H. DEFENDANT WAS ENRICHED BY ITS DISCLOSURE OF PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES.

#### 1. Defendant Received Material Benefits in Exchange for Plaintiff's Sensitive Health Information.

117. As explained, *supra*, users of the Tracking Tool Providers' Business Tools, like Defendant, receive access to advertising and marketing analytics services in exchange for installing the Tracking Tools on its website.

118. Upon information and good faith belief, Defendant, as a user of the Tracking Tool Providers' Business Tools, received compensation in the form of advanced advertising services and cost-effective marketing on third-party platforms in exchange for allowing the Tracking Tool Providers to collect Plaintiff's and Class Members' Sensitive Health Information.

#### 2. Plaintiff's and Class Members' Data Had Financial Value.

119. Plaintiff's and Class Members' Sensitive Health Information has value, and Defendant's disclosure and interception of that Sensitive Health Information harmed Plaintiff and the Class.

120. According to the annual reports of Facebook, another major online advertising proprietor, the value it derives from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising

sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[38]

121. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

122. Several companies have products through which they pay consumers for a license to track certain information. Indeed, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies, in addition to Google, that pay for browsing history information.

123. Meta also has paid users for their digital information, including browsing history. Until 2019, Meta ran a "Facebook Research" app through which it paid individuals $20 a month to collect browsing history information and other communications.

124. This information is most valuable when access to it is limited. Accordingly, the unauthorized disclosure of Plaintiff's and Class Members' private and Sensitive Health Information has diminished the value of that information, resulting in harm to Plaintiff and Class Members.

## I. DEFENDANT'S USE OF THE TRACKING TOOLS VIOLATES HIPAA.

125. The disclosure of Plaintiff's and Class Members' Private Information via the Tracking Tools contravenes the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the

[38] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Mar. 3, 2026).

"Privacy Rule") which governs how health care providers must safeguard and protect Private Information.[39]

126. The HIPAA Privacy Rule sets forth policies to protect all Individually Identifiable Health Information ("IIHI") and Personal Health Information ("PHI") that is held or transmitted by a covered entity such as Defendant.

127. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

128. Each of the Tracking Tool Providers use identifiers which either "identifies the individual" associated with the identifiers or for which there is a reasonable basis to believe the information can be used to identify the individual.

129. The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

130. There are 18 HIPAA Identifiers that are considered personally identifiable information because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Google account) to identify a single individual. When IIHI is used in conjunction

[39] *The HIPAA Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html (last visited Mar. 24, 2025).

with one's physical or mental health or condition, health care, and/or one's payment for that health care, it becomes Personal Health Information ("PHI").

131. Additionally, information revealing that an individual is receiving medical service or treatment is PHI. In its 2012 Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the U.S. Department of Health and Human Services (HHS) instructed health care providers that, while identifying information alone is not necessarily PHI if it is part of a public source uncoupled from health data (e.g., a phone book), "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."

132. HHS has repeatedly instructed covered entities that patient status is protected by the HIPAA Privacy Rule:

i. "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

ii. "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002); and

iii. It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013).

133. While healthcare entities regulated under HIPAA may use third-party tracking tools, such as the Tracking Tools, they can do so only in a very limited way, i.e., to perform analysis on data key to their operations.

134. When the information that a regulated entity collects through technologies or discloses to third parties (e.g., tracking technology vendors like Google) includes PHI, the protections under the HIPAA Privacy Rule apply.[40]

135. Put simply, HIPAA covered entities such as Defendant are not permitted to use tracking technology tools (like Pixels) in a way that exposes an individual's PHI to any third party without that individual's express and informed consent.

136. In a joint letter to approximately 130 hospital systems and telehealth provides, the Office for Civil Rights (OCR) at the HHS and Federal Trade Commission (FTC) acknowledged that tracking technology tools "gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users."[41] Disclosures to third parties by these tracking tools can "reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[42]

137. The HHS and FTC warn that the "[i]mpermissible disclosures of an individual's [PHI] to third parties may result in a wide range of harms to an individual or others," including "identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others."[43]

138. Under Federal Law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or

---

[40] *See Letter regarding Use of Online Tracking Technologies*, FEDERAL TRADE COMMISSION, available at: https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf (last visited Mar. 24, 2026).

[41] *Id.*

[42] *Id.*

[43] *Id.*

household member of a patient for marketing purposes without the patients' express written authorization.[44]

139. Consistent with this restriction, the HHS has issued marketing guidance that provides:

> With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list.[45]

140. The HIPAA Privacy Rule further requires any "covered entity"—which includes Defendant—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

141. In contravention of HIPAA, Defendant failed to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information[,]" 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

142. Defendant failed to comply with other HIPAA safeguard regulations as follows:

iv. Failing to ensure the confidentiality and integrity of electronic

---

[44] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

[45] *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Mar. 24, 2026).

PHI that Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

v. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. section 164.308(a)(1);

vi. Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendant in violation of 45 C.F.R. § 164.308(a)(6)(ii);

vii. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

viii. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

ix. Failing to effectively train their workforces (including independent contractors) on the policies and procedures for PHI as necessary and appropriate to carry out job functions while maintaining security of PHI beyond using imitation phishing email software in violation of 45 C.F.R. §§ 164.530(b) and 164.308(a)(5); and

x. Failing to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

143. Defendant violated the Privacy Rule by providing patient information to third parties without first obtaining express consent from Plaintiff and Class Members.

/ / /

/ / /

/ / /

### J. PLAINTIFF'S AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY.

144. At all times when Plaintiff and Class Members provided their Sensitive Health Information to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share the Sensitive Health Information with third parties for a commercial purpose unrelated to providing them with medical care.

145. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

146. For example, a recent Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[46]

147. Moreover, Americans are particularly interested in the safety of their health information. Over 50-percent of Americans believe that "medical-records privacy is not sufficiently protected today by law and organizational practices."[47]

---

[46] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited Mar. 3, 2026).

[47] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

148. And, in a study performed by the National Institutes of Health, nearly 80-percent of respondents reported being "very concerned" or "concerned" about the privacy of medical records.[48]

149. Personal data privacy and obtaining consent to share Sensitive Health Information are material to Plaintiff and Class Members.

150. Most websites, including Defendant's website, use HyperText Transfer Protocol Secure (HTTPS), a protocol for transmitting information over the internet.

151. When using HTTPS, nearly all communication between a website user and the website is encrypted.[49] The only information transmitted unencrypted is the identity of the web "host." For example, if searching Google for https, one may visit the following url: https://www.google.com/search?q=https. The "host" in this url is www.google.com. This information must be transmitted unencrypted, because it is routing information required to identify the destination for the request. The remainder of the information transmitted, including the "search?q=https" portion of the URL, is transmitted encrypted.

152. Because nearly all information between a browser and a website is encrypted, an observer of those communications (such as an individual's internet service provider) could learn that the user of the browser is communicating with a specific website, and certain record information, such as how often those communications occur, but an observer could not learn about the substance of the communications, including which web pages the user visited.

---

[48] Daniel S Gaylin, Adil Moiduddin, Shamis Mohamoud, Katie Lundeen, Jennifer A Kelly, *Public Attitudes about Health Information Technology, and Its Relationship to Health Care Quality, Costs, and Privacy*, HEALTH SERV. RES. (2011), *available online at* https://pmc.ncbi.nlm.nih.gov/articles/PMC3097409/pdf/hesr0046-0920.pdf.

[49] Tanish Dewase, *Why Do We See Query Parameters in HTTPS URLs? Is It Still Secure?*, MEDIUM, (July 30, 2025) https://medium.com/h7w/why-do-we-see-query-parameters-in-https-urls-is-it-still-secure-5f3b6ee7702a

153. Due to encryption, even a technically sophisticated user of the internet can reasonably expect a significant degree of privacy in any of their communications sent over HTTPS: users can reasonably expect that the contents of their communications, including the web pages they visit and any inquiries they make on those web pages, will only be available to the user themselves and the website operator.

154. Encryption of URLs is important, due to commonly followed practices in website design. It is considered a "best practice" by many website developers to make URLs, or "Universal Resource Locators" organized and relatively human-readable. The URL path, therefore, often contains important information about the contents of the information transmitted using the URL.[50]

155. Using a hypothetical example, a website used to sell products including tools and toys and services including construction and painting, might make each available at the following paths: products/tools, products/toys, services/construction/ and services/painting. The website may be even further categorized, so that a hypothetical "Super Hammer" would be available at products/tools/hammers/super-hammer. Similarly, the purchase of a "Super Hammer" could send a request to purchase/products/tools/hammers/super-hammer. Thus, disclosing the URLs of a web user's communications with a website often discloses substantial amounts of information about the user's interactions with the website, allowing a third party who knows about those communications to make substantial inferences about the purpose of those interactions.

156. Cenikor's website operates similarly. The URLs of its web pages for its Houston location "cenikor.org/locations/addiction-recovery-houston-detox-rehab"

[50] Neil Patel, *The Complete Guide on Structuring Your URLs Correctly*, NEILPATEL, https://neilpatel.com/blog/complete-guide-structuring-urls/ (last visited March 27, 2026).

and for adult drug and alcohol abuse, “cenikor.org/programs/demographic/adult-drug-rehab/,” contain information related to the contents of those pages. If a third party learned that a user visited both those pages, and that the user then initiated a phone call to make an appointment with Cenikor or provided Cenikor information about their insurance and asked Cenikor to evaluate that information, the third party could reasonably infer that the user sought treatment for adult substance abuse at the Cenikor location in Houston, TX.

157. But Defendant’s website uses HTTPS, so even a technically sophisticated user would reasonably expect privacy in their communications, because third parties viewing the communications discussed in the previous paragraph could only learn that the users visited cenikor.org, but third parties could only guess as to the purpose of the visit. Use of HTTPS helps ensure that users of the internet can reasonably expect a substantial degree of privacy in their browsing activity. Defendant’s use of the Tracking Tools violates those reasonable expectations, particularly when it uses the Tracking Tools to conduct individually-identifiable tracking of telephone calls initiated by users and insurance evaluation requests submitted by users.

## V. <u>TOLLING AND ESTOPPEL</u>

158. Any applicable statutes of limitation have been tolled by Defendant’s knowing and active concealment of the incorporation of the Tracking Tools onto the Website.

159. The Tracking Tools on the Website were and are invisible to the average website visitor.

160. Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant’s deception and unlawful conduct.

161. Plaintiff was ignorant of the information essential to pursue his claims, without any fault or lack of diligence on his part.

162. Defendant had exclusive knowledge that the Website incorporated the Pixels and other Tracking Tools and yet failed to disclose to users, including Plaintiff and Class Members, that initiating a call or submitting the Insurance Verification on the Website, Plaintiff's and Class Members' Sensitive Health Information would be disclosed or released to unauthorized third parties, including Google and Microsoft.

163. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its users' Sensitive Health Information. In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to its users that they have disclosed or released their Sensitive Health Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

164. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

165. The earliest that Plaintiff or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

## VI. <u>CLASS ALLEGATIONS</u>

166. This action is brought by the named Plaintiff on his behalf and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

167. Specifically, the Nationwide Class that Plaintiff seeks to represent is defined, as follows:

**NATIONWIDE CLASS**

All natural persons who used the Website and whose Sensitive Health Information was disclosed or transmitted to the Tracking Tool Providers, or any other unauthorized third party via the Tracking Technologies.

168. Plaintiff also asserts claims on behalf of, at least, the following state subclass:

**CALIFORNIA SUBCLASS**

All natural persons in California who used the Website, and whose Sensitive Health Information was disclosed or transmitted to one or more of the Tracking Tool Providers, or any other unauthorized third party via the Tracking Technologies.

169. For purposes of these class definitions, information does not constitute Sensitive Health Information if it only indicates an individual browsed the Website, unless the user also took a specific action to express interest in treatment, such as initiating a phone call to Cenikor or submitting their insurance information to Cenikor.

170. Excluded from the proposed Classes are any claims for personal injury, wrongful death, or other property damage sustained by the Classes; Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns; and any Judge conducting any proceeding in this action and members of their immediate families.

171. Plaintiff reserves the right to amend the definitions of the Classes or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

172. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. There are at least 1,000 individuals that have been impacted by Defendant's actions. Moreover, the exact number of those impacted is

generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

173. **Commonality.** Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

a. Whether and to what extent Defendant had a duty to protect the Sensitive Health Information of Plaintiff and Class Members;

b. Whether Defendant had duties not to disclose the Sensitive Health Information of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Sensitive Health Information would be disclosed to third parties;

d. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Sensitive Health Information was being disclosed without their consent;

e. Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of users' Sensitive Health Information;

f. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Sensitive Health Information belonging to Plaintiff and Class Members free from unauthorized disclosure;

g. Whether Defendant violated the statutes asserted as claims in this Complaint;

h. Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

i. Whether Defendant knowingly made material omissions with respect to its data security and/or privacy practices; and

j. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Sensitive Health Information.

174. **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiff's Sensitive Health Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the Tracking Tools.

175. **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

176. **Predominance**. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members in that all the Plaintiff's and Class Members' data was unlawfully disclosed to unauthorized third parties, including the Tracking Tool Providers, in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

177. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action

presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

178. Defendant acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

179. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting and safeguarding their Sensitive Health Information and not disclosing it to unauthorized third parties;

b. Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Health Information;

c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Sensitive Health Information would be disclosed to third parties;

e. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

f. Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

180. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to the names of each Class Members—each of whom called Defendant's admissions employees directly from the Website and/or completed the Insurance Verification on Defendant's Website—affected by the unauthorized disclosures that have taken place.

**COUNT I**
**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2511(1), *ET SEQ.***
**Unauthorized Interception, Use, and Disclosure**
***(On Behalf of Plaintiff and the Nationwide Class)***

181. Plaintiff repeats and realleges the allegations contained in paragraphs 1-182 as if fully set forth herein.

182. The ECPA protects both sending and receipt of communications.

183. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

184. The transmissions of Plaintiff's Sensitive Health Information to the Website qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

185. Electronic Communications. The transmission of Sensitive Health Information between Plaintiff and Class Members and Defendant, through the Website, are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

186. Content. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance,

purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

187. Interception. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents . . . include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

188. Electronic, Mechanical, or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiff's and Class Members' browsers;

b. Plaintiff's and Class Members' computing devices;

c. Defendant's web-servers; and

d. The Pixel code deployed by Defendant to effectuate the sending and acquisition of user and Website user communications.

189. By utilizing and embedding the Pixels and Tracking Tools on the Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

190. Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Pixels and Tracking Tools, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Sensitive Health Information to third parties such as Google and Microsoft.

191. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff and Class Members regarding their Sensitive Health Information, including information related to phone calls Plaintiff and Class Members made to treatment centers and any requests Plaintiff and Class Members made for Insurance Verification.

192. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to third parties, while knowing or having reason to know that such information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

193. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

194. Unauthorized Purpose. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

195. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

196. Defendant is not a party to the communication based on its unauthorized duplication and transmission of communications with Plaintiff and the Class. However, even assuming Defendant is a party, Defendant's simultaneous,

unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Sensitive Health Information does not qualify for the party exception.

197. Defendant's acquisition of sensitive communications that was used and disclosed to Google and Microsoft was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

a. Invasion of privacy;

b. Breach of confidence;

c. Breach of fiduciary duty; and

d. Violations of HIPAA, 42 U.S.C. § 1320d-6(a)(3).

198. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it used and caused to be used cookie identifiers associated with specific users, including Plaintiff and Class Members, without user authorization; and disclosed individually identifiable Sensitive Health Information to Google and Microsoft without user authorization.

199. Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiff's and Class Members' communications about their Sensitive Health Information on the Website, because it used its participation in these communications to improperly share Plaintiff's and Class Members' Sensitive Health Information with Google, Microsoft, and other third-parties that did not participate in these communications, that Plaintiff and Class Members did not know were receiving their Sensitive Health Information, and that Plaintiff and Class Members did not consent to receive their Sensitive Health Information.

200. As such, Defendant cannot viably claim any exception to ECPA liability.

201. Plaintiff and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a. Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their Sensitive Health Information for commercial purposes has caused Plaintiff and Class Members to suffer emotional distress;

b. Defendant received substantial financial benefits from its use of Plaintiff's and Class Members' Sensitive Health Information without providing any value or benefit to Plaintiff or Class Members;

c. Defendant received substantial, quantifiable value from its use of Plaintiff's and Class Members' Sensitive Health Information, such as understanding how people use the Website and determining what ads people see on the Website, without providing any value or benefit to Plaintiff or Class Members;

d. Defendant failed to provide Plaintiff and Class Members with the full value of the services for which they paid, which included a duty to maintain the confidentiality of their Sensitive Health Information; and

e. The diminution in value of Plaintiff's and Class Members' Sensitive Health Information and/or the loss of privacy due to Defendant making such Sensitive Health Information, which Plaintiff and Class Members intended to remain private, no longer private.

202. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Tracking Tools to track and utilize Plaintiff's and Class Members' Sensitive Health Information for financial gain.

203. Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

204. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading their privacy via the Pixels.

205. Any purported consent that Defendant may claim it received from Plaintiff and Class Members was not valid.

206. In sending and acquiring the content of Plaintiff's and Class Members' communications relating to their use of the Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

207. As a result of Defendant's violation of the ECPA, Plaintiff and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorneys' fees and costs.

## COUNT II
## COMMON LAW INVASION OF PRIVACY
***(On Behalf of Plaintiff and the Nationwide Class, or alternatively, the California Subclass)***

208. Plaintiff repeats and realleges the allegations contained in paragraphs 1-209 as if fully set forth herein.

209. Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, highly personal Sensitive Health Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected

to the exfiltration of their communications without Plaintiff's and Class Members' knowledge or consent.

210. Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via the Website and the communications platforms and services therein.

211. Plaintiff and Class Members communicated Sensitive Health Information that they intended for only Defendant to receive and that they understood Defendant would keep private and secure.

212. Defendant's interception and disclosure of the substance and nature of those communications to third parties without the knowledge and informed consent of Plaintiff and Class Members is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion.

213. Plaintiff and Class Members have a general expectation that their communications regarding sensitive, highly personal information would be protected from surreptitious disclosure to third parties.

214. Defendant's disclosure and publicization of Plaintiff's and Class Members' Sensitive Health Information coupled with individually identifying information is highly offensive to the reasonable person.

215. As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

216. Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to compensatory and/or nominal damages.

217. Plaintiff and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiff and

Class Members for the harm to their privacy interests as a result of the intrusions upon their privacy.

218. Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

219. Plaintiff also seeks such other relief as the Court may deem just and proper.

## COUNT III
## BREACH OF CONFIDENCE
***(On Behalf of Plaintiff and the Nationwide Class, or alternatively, the California Subclass)***

220. Plaintiff repeats and realleges the allegations contained in paragraphs 1-221 as if fully set forth herein.

221. Medical providers have a duty to their patients to keep non-public medical information completely confidential.

222. Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

223. Contrary to its duties as a medical provider and its promises of confidentiality, Defendant deployed the Tracking Tools to disclose and transmit Plaintiff's and Class Members' Sensitive Health Information and the contents of their communications exchanged with Defendant to third parties.

224. The third-party recipients included, but were not limited to, Google, TikTok, Snapchat, Twitter, Microsoft, and other online marketers.

/ / /

225. Defendant's disclosures of Plaintiff's and Class Members' Sensitive Health Information were made without their knowledge, consent or authorization, and were privileged.

226. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

227. As a direct and proximate cause of Defendant's unauthorized disclosures of personally identifiable, non-public medical information and communications, Plaintiff and Class Members were damaged by Defendant's breach in that:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of the provider-patient relationship;

c. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensating Plaintiff and Class Members for the data;

d. Defendant's actions diminished the value of Plaintiff's and Class Members' Sensitive Health Information; and

e. Defendant's actions violated the property right Plaintiff and Class Members have in their Sensitive Health Information.

228. Plaintiff and Class Members are therefore entitled to general damages for invasion of their rights in an amount to be determined by a jury and nominal damages for each independent violation. Plaintiff is also entitled to punitive damages.

/ / /

/ / /

**COUNT IV**

**BREACH OF FIDUCIARY DUTY**

***(On Behalf of Plaintiff and the Nationwide Class, or alternatively, the California Subclass)***

229. Plaintiff repeats and realleges the allegations contained in paragraphs 1-230 as if fully set forth herein.

230. In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became guardian of Plaintiff's and Class Members' Sensitive Health Information, Defendant became a fiduciary by its undertaking and guardianship of the Sensitive Health Information, to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff's and Class Members' Sensitive Health Information; (2) to timely and adequately notify Plaintiff and Class Members of an unauthorized disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

231. Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendant's relationship with its patients, potential patients and former patients, and in particular, to keep their Sensitive Health Information secure.

232. Defendant breached its fiduciary duties to Plaintiff and Class Members by disclosing their Sensitive Health Information to unauthorized third parties, including Google and Microsoft, and separately, by failing to notify Plaintiff and Class Members of this fact.

233. As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer injury and are entitled to compensatory, nominal, and/or punitive damages, and disgorgement of profits, in an amount to be proven at trial.

## COUNT V
## NEGLIGENCE
***(On Behalf of Plaintiff and the Nationwide Class, or alternatively, the California Subclass)***

234. Plaintiff repeats and realleges the allegations contained in paragraphs 1-235 as if fully set forth herein.

235. Through their use of the Website, Plaintiff and Class Members provided Defendant with their Sensitive Health Information, believing such information would be kept confidential.

236. By collecting and storing this data, Defendant had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

237. Defendant negligently failed to take reasonable steps to protect Plaintiff's and Class Members' Sensitive Health Information from being disclosed to third parties, without their consent, including to the Tracking Tool Providers.

238. Defendant further negligently omitted to inform Plaintiff and the Class that it would use their Sensitive Health Information for marketing purposes, and/or that their Sensitive Health Information would be transmitted to third parties.

239. Defendant knew, or reasonably should have known, that Plaintiff and the Class would not have provided their Sensitive Health Information to Defendant had they known that Defendant intended to use that Information for unlawful purposes.

240. Defendant's conduct has caused Plaintiff and the Class to suffer damages by having their highly personal, personally identifiable Sensitive Health Information accessed, stored, and disseminated without their knowledge or consent.

/ / /

/ / /

241. Though all medical information is sensitive, the disclosing information related to addiction can have personal and economic repercussions above and beyond those associated with other medical conditions.

242. Plaintiff and Class Members are entitled to compensatory, nominal, and/or punitive damages.

243. Defendant's negligent conduct is ongoing, in that it still holds the Sensitive Health Information of Plaintiff and Class Members in an unsafe and unsecure manner. Therefore, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

## COUNT VI
## BREACH OF IMPLIED CONTRACT
***(On Behalf of Plaintiff and the Nationwide Class, or alternatively, the California Subclass)***

244. Plaintiff repeats and realleges the allegations contained in paragraphs 1-245 as if fully set forth herein.

245. When Plaintiff and Class Members provided their Sensitive Health Information to Defendant in exchange for information and services related to addiction treatment, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose the Sensitive Health Information without consent.

246. Plaintiff and Class Members accepted Defendant's offers and provided their Sensitive Health Information to Defendant.

247. Plaintiff and Class Members would not have entrusted Defendant with their Sensitive Health Information in the absence of an implied contract between

them and Defendant obligating Defendant to not disclose Sensitive Health Information without consent.

248. Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Sensitive Health Information to third parties like Google and Microsoft.

249. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein.

250. Plaintiff and Class Members would not have used Defendant's services, or would have paid substantially less for those services, had they known their Sensitive Health Information would be disclosed.

251. Plaintiff and Class Members are entitled to compensatory, consequential, and/or nominal damages as a result of Defendant's breaches of implied contract.

## COUNT VII
## UNJUST ENRICHMENT
***(On Behalf of Plaintiff and the Nationwide Class, or alternatively, the California Subclass)***

252. Plaintiff repeats and realleges the allegations contained in paragraphs 1-253 as if fully set forth herein.

253. Plaintiff pleads this claim in the alternative to his breach of implied contract claim.

254. Plaintiff and Class Members conferred a monetary benefit on Defendant in exchange for information and services related to addiction treatment. Specifically, they provided their Sensitive Health Information to Defendant which Defendant then utilized for marketing and advertising purposes, as described, *supra*.

/ / /

255. Defendant knew that Plaintiff and Class Members conferred a benefit upon them, which Defendant accepted. Defendant profited from the Sensitive Health Information of Plaintiff and Class Members by exchanging it for marketing and advertising services.

256. In particular, Defendant enriched itself by obtaining the inherent value of Plaintiff's and Class Members' Sensitive Health Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiff's and Class Members' Sensitive Health Information.

257. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the privacy of its user's and Sensitive Health Information.

258. Under the principles of equity and good conscience, Defendant should not be permitted to retain such benefits obtained by its surreptitious collection and transmission of Plaintiff's and Class Members' Sensitive Health Information.

259. If Plaintiff and Class Members knew that Defendant had not reasonably secured their Sensitive Health Information, they would not have agreed to provide their Sensitive Health Information to Defendant.

260. Plaintiff and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of money damages.

261. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer injury.

262. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them, or to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

**COUNT VIII**

**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**

**CAL. PENAL CODE § 631**

***(on behalf of Plaintiff and the California Subclass)***

263. Plaintiff repeats and realleges the allegations contained in paragraphs 1-253 as if fully set forth herein.

264. The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

265. Cal. Penal Code § 631 imposes liability on any person who "by means of any machine, instrument, contrivance, or in any other manner" (1) "intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument," (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [the state of California]," (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained," or (4) "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

266. Cenikor is a person for purposes of § 631.

267. The Tracking Technologies, Plaintiff's and Subclass Members' computers and devices are each a "machine, instrument, contrivance, or . . . other manner" under § 631.

268. At all relevant times, Cenikor aided, employed, agreed with, and conspired with third parties, including at least Google, Microsoft, Twitter, Snapchat and TikTok, and the other Tracking Tool Providers, to track and intercept Plaintiff's and Class Members' internet communications while accessing the Website. These communications were transmitted to and intercepted by third parties during the communication and without the knowledge, authorization, or consent of Plaintiff's and Class Members.

269. Cenikor intentionally inserted an electronic listening device onto Plaintiff's and Class Members' web browsers that, without their knowledge and consent, tracked, intercepted, and transmitted the substance of their confidential communications with Cenikor to the Tracking Tool Providers—each of whom constitute a "person" within the meaning of the statute.

270. Cenikor willingly facilitated third parties' interception and collection of Plaintiff's and Class Members' private health information by embedding the Tracking Technologies on the Website. Cenikor has full control over the Tracking Technologies, including which webpages contain them, what information is tracked and transmitted, and how events are categorized prior to their transmission.

271. Cenikor failed to disclose its use of the Tracking Technologies to specifically track and automatically and simultaneously transmit Plaintiff's and Class Members' communications with Cenikor to undisclosed third parties.

272. The Tracking Technologies are designed such that they transmit a website user's actions and communications contemporaneously as the user initiates each communication, and so they are used in real-time to begin identifying and

tracking the actions of individual consumers. As a result, the communications were intercepted and used in transit before reaching their final resting point.

273. Thus, Cenikor violated CIPA § 631 by aiding and permitting third parties to intercept and receive its users' online communications in real time as they were made via the Website. Importantly, the Tracking Tool Providers would not have intercepted or received the contents of these communications but for Cenikor's actions and incorporation of the Tracking Technologies into the Website.

274. By disclosing Plaintiff's and Class Members' private information, including Sensitive Health Information, Cenikor violated Plaintiff's and Class Members' statutorily protected right to privacy.

275. This conduct occurred in California, where Plaintiff and Class Members reside and were harmed, and where these communications were received by the Tracking Tool Providers. Each of these entities maintain their principle places of business in California and used the content of Plaintiff's and Class Members' communications from this location.

276. Plaintiff and the Class Members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief that may be proper.

277. Plaintiff and Class Members have also suffered irreparable injury from these unauthorized acts. Plaintiff's and Class Members' confidential and private data has been collected, viewed, accessed, used, and stored by Cenikor, and has not been destroyed. Due to the continuing threat of such injury, Plaintiff and Class Members have no adequate remedy at law, and therefore, Plaintiff and Class Members are entitled to equitable relief, including injunctive relief.

/ / /

## COUNT IX
## VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE §§ 638.50 & 638.51
***(On behalf of Plaintiff and the California Subclass)***

278. Plaintiff repeats and realleges the allegations contained in paragraphs 1-253 as if fully set forth herein.

279. CIPA § 638.50(b) defines a "pen register" as a "device or process" that "records or decodes dialing, routing, addressing, or signaling information" that is "transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

280. Separately, CIPA § 638.50(c) defines a "[t]rap and trace device" as a "device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."

281. CIPA § 638.51 prohibits a person from installing either a pen register or trap and trace device without a court order.

282. Cenikor is a person under CIPA § 638.51.

283. Cenikor implemented and installed the Tracking Technologies—which are pen registers and/or trap and trace devices—on Plaintiff's and Class Members' devices and browsers.

284. These Tracking Technologies captured "routing, addressing, or signaling information" because they intercept email addresses, unique user and device identifiers, including IP address, and cookies used for purposes of identification.

/ / /

/ / /

285. Cenikor was not authorized by any court order to use a pen register or trap and trace device to record or capture Plaintiff's and Class Members' routing, addressing, or signaling information.

286. The California Plaintiff and Class Members did not consent to Cenikor's installation of a pen register or trap and trace device on their devices and browsers.

287. The California Plaintiff and Class Members have been harmed as a result of Cenikor's conduct. Cenikor did not have authorization to use pen registers and/or trap and trace devices to surveille and identify Plaintiff's and Class Members or other routing, addressing, and signaling information revealing who the intended recipients of their communications were.

288. The California Plaintiff and Class Members face an imminent threat of continued injury, as this data continues to be stored and used by third parties, such that Plaintiff and Class Members have no adequate remedy at law.

289. The California Plaintiff and Class Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

**COUNT X**

**INVASION OF PRIVACY UNDER ARTICLE I, SECTION 1 OF THE CALIFORNIA CONSTITUTION**

***(On behalf of Plaintiff and the California Subclass)***

290. Plaintiff repeats and realleges the allegations contained in paragraphs 1-253 as if fully set forth herein .

291. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are

enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

292. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

293. The right to privacy in California's Constitution creates a right of action against private and government entities.

294. Plaintiff and the California Subclass Members have and continue to have a reasonable expectation of privacy in their personal information, identities, and private data, pursuant to Article I, Section I of the California Constitution.

295. The identifiable and private information Cenikor disclosed to third parties without Plaintiff's and California Subclass Members' consent was used, among other things for targeted advertising purposes. The manner in which Cenikor disclosed this information defeated established privacy-mechanisms, social norms, reasonable expectations, and various laws, including HIPAA.

296. This conduct constitutes an extremely serious invasion of privacy that would be highly offensive to a reasonable person. Reasonable individuals do not expect that there are third parties intercepting their private health information, let alone using it for profit.

297. Cenikor's conduct violated the privacy of hundreds of thousands (if not millions) of Class Members, including Plaintiff. Cenikor did not have consent to disclose this information.

298. Plaintiff and Class Members have been damaged as a direct and proximate result of Cenikor's privacy invasions and are entitled to just

compensation, including monetary damages. Plaintiff and Class Members seek all appropriate relief for that injury, including but not limited to damages and all other relief that may be just or proper.

299. Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Cenikor's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Cenikor from engaging in such conduct in the future.

**COUNT XI**

**VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW**
**CAL. BUS. & PROF. CODE § 17200 *ET SEQ.***
***(on behalf of Plaintiff and the California Subclass)***

300. Plaintiff repeats and realleges the allegations contained in paragraphs 1-253 as if fully set forth herein .

301. California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code § 17200.

302. Cenikor is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

303. Cenikor violated the UCL by engaging in unlawful and unfair business acts and practices.

304. Cenikor's "unlawful" acts and practices include its violation of HIPAA, the ECPA, CIPA, Cal. Penal Code §§ 630, *et seq.*; the CDAFA, Cal. Penal Code § 502, and the common law right of privacy.

305. Cenikor's conduct violated the spirit and letter of these laws, which protect property and privacy interests and prohibit the unauthorized disclosure of private communications and personal information, including health information.

/ / /

306. Cenikor's "unfair" acts and practices include its surreptitious disclosure of private communications and personal information, including Plaintiff's and Class Members' private health information without consent. This was especially unfair in light of Cenikor's representation that it complied with HIPAA and would not disclose HIPAA-protected information without express consent.

307. Plaintiff and California Subclass Members were completely unaware of Cenikor's conduct and could not have anticipated Cenikor's intrusion into their privacy through its unlawful and unfair disclosure of their personal health information and private communications to third parties, including the Tracking Tool Providers. Accordingly, Plaintiff and California Subclass Members could not avoid the harm Cenikor caused.

308. Cenikor's conduct was immoral, unethical, oppressive, unscrupulous and substantially injurious to Plaintiff and Class Members. Further, the gravity of the harm of Cenikor's secret disclosure of Plaintiff and Class Members' personal health information and private communications is significant, and there is no corresponding benefit resulting from such conduct.

309. The California Plaintiff and Class Members suffered injury, damage, and loss as a result of Cenikor's conduct. Cenikor's practices have deprived Plaintiff and the Class Members of control over their valuable property (namely, their private data), the ability to receive compensation for that data, and the ability to withhold their data for sale. Cenikor's practices have violated Plaintiff's and Class Members' private interests by collecting, disclosing, and using their private data.

310. Finally, Cenikor has reaped unjust profits and revenues in violation of the UCL as a result of its unlawful and unfair conduct, including profits and revenues from its use of Plaintiff's and Class Members' data for targeted advertising. Plaintiff and California Subclass Members seek restitution and

disgorgement of these unjust profits and revenues, which are separate losses and harms.

311. Plaintiff and California Subclass Members seek all monetary and non-monetary relief allowed under the statute and equity, including restitution; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief permissible under the UCL.

## COUNT XII
## VIOLATIONS OF THE COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT, CAL. PENAL CODE § 502 ("CDAFA")
***(on behalf of Plaintiff and the California Subclass)***

312. Plaintiff repeats and realleges the allegations contained in paragraphs 1-253 as if fully set forth herein.

313. The California Legislature enacted CDAFA to "expand the degree of protection afforded . . . from tampering, interference, damage, and unauthorized access to ([including the extraction of data from)] lawfully created computer data and computer systems," finding and declaring that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . forms of unauthorized access to computers, computer systems, and computer data," and that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals . . ." Cal. Penal Code § 502(a).

314. Plaintiff and the California Subclass Members' devices, device systems, device network, and browsers constitute "computer, computer system, or computer network" within the meaning of the CDAFA. *Id.* § 502(b)(5). The functionality of these devices, systems, and networks constitute "[c]omputer services" within the meaning of the CDAFA. *Id.* § 502(b)(4).

315. The data that Cenikor and third parties accessed, used, and/or disclosed from Plaintiff's and Class Members' devices constitute "[d]ata" within the meaning of the CDAFA. *Id.* § 502(b)(8) (defining data to mean "a representation of information, knowledge, facts, concepts, computer software, computer programs or instructions. Data may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device.").

316. Cenikor violated § 502(c)(1) of the CDAFA by knowingly accessing, without permission, Plaintiff and California Subclass Members' devices in order to wrongfully obtain, disclose, and use their personal data in violation of users' reasonable expectations of privacy in their devices and data.

317. Cenikor violated § 502(c)(2) of the CDAFA by knowingly and without permission taking, copying, and making use of Plaintiff and the California Subclass Members' unique identifiers and other personal data from their devices.

318. Cenikor violated § 502(c)(3) by knowingly and without permission causing the functionality of Plaintiff's and Class Members' devices to be used for the purposes of obtaining, taking, copying, and using Plaintiff's and Class Members' personal data.

319. Cenikor violated § 502(c)(7) by knowingly and without permission accessing Plaintiff's devices, and the functionality thereof.

320. Cenikor violated §§ 502(c)(6) and (c)(13) of the CDAFA by knowingly, and without permission from Plaintiff and the Class Members, providing and/or assisting in providing advertisers, including the Tracking Tool Providers, the ability to access Plaintiff and the California Subclass Members' devices, device systems, device networks, and browsers via the Tracking Technologies and identifying mechanisms incorporated on the Website.

321. Under § 502(b)(12) of the CDAFA a "Computer contaminant" is defined as "any set of computer instructions that are designed to . . . record, or

transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information." The Tracking Technologies Cenikor incorporated on the Website constitute computer contaminants as defined by § 502(b)(12) of the CDAFA. Cenikor violated § 502(c)(8) by knowingly and without permission introducing computer contaminants, including Meta, Google, Snap, and TikTok's Tracking Technologies on Plaintiff's and the Class Members' devices, device systems, device networks, and browsers, which intercepted and disclosed their personal health data to third parties. As described *supra*, the Tracking Technologies are hidden on the Website and Plaintiff and California Subclass Members had no way to remove it or opt out of its functionality.

322. Plaintiff and Class Members suffered damage and loss as a result of Cenikor's conduct. Cenikor's practices have deprived Plaintiff and the Class Members of control over their valuable property (namely, their sensitive personal health data), the ability to receive compensation for that data, and the ability to withhold their data for sale. Plaintiff and Class Members suffered harm because Cenikor unjustly profited from the PII and private data Cenikor disclosed by using it for its own business purposes, like targeted advertising. Cenikor's use of the Tracking Technologies has caused harm to Plaintiff and Class Members by taking up additional bandwidth, CPU time, data usage, and power consumption in their devices. Cenikor's practices have also violated Plaintiff's and Class Members' private interests by collecting and disclosing their PII and other private information.

323. Plaintiff and the Class Members seek compensatory damages in accordance with CDAFA § 502(e)(1), in an amount to be proven at trial, and injunctive or other equitable relief.

324. Plaintiff and Class Members have also suffered irreparable and incalculable harm and injuries from Cenikor's violations. The harm will continue

unless Cenikor is enjoined from further violations of this section. Plaintiff and Class Members have no adequate remedy at law.

325. Plaintiff and the Class Members are entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because Cenikor's violations were willful and, upon information and belief, Cenikor is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294. Plaintiff and the Class Members are also entitled to recover their reasonable attorneys' fees under § 502(e)(2).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and other Class Members, prays for judgment against Defendant as follows:

A. an Order certifying the Class, and appointing the Plaintiff and his Counsel to represent the Class;

B. equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Sensitive Health Information of Plaintiff and Class Members;

C. injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members;

D. an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E. an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. prejudgment interest on all amounts awarded; and

G. all such other and further relief as this Court may deem just and proper.

Dated: April 28, 2026

Respectfully submitted,

*/s/ Catherine E. Ybarra*
Catherine E. Ybarra (SBN 283360)
**SIRI & GLIMSTAD LLP**
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Tel: 213-297-3807
E; cybarra@sirillp.com

Sonjay C. Singh*
**SIRI & GLIMSTAD LLP**
400 East Pratt Street
8th Floor - #16946751
Baltimore, MD 21202
Tel: (212) 532-1091
E: ssingh@sirillp.com

Zane Johnson*
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: zjohnson@sirillp.com

**pro hac vice forthcoming*

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and other members of the proposed Class, hereby demands a jury trial on all issues so triable.

Dated: April 28, 2026

Respectfully submitted,

*/s/ Catherine E. Ybarra*
Catherine E. Ybarra (SBN 283360)